## THE CAPTAIN MILLER.

### THE MANATEE.

### GARNER et al. v. THE CAPTAIN MILLER.

### McINTIRE v. THE MANATEE.

*(Circuit Court, N. D. Florida.   January 9, 1888.)*

COLLISION—FAILURE TO COMPLY WITH SIGNALS—MUTUAL FAULT.

    Two steam-boats were going in the same direction, one in advance of the other. The rear boat signaled a desire to pass the other to the starboard; the other boat signaled a desire to continue her course; but neither fully complied with the meaning of its signal, and, as a consequence, a collision resulted. *Held*, each contributed to the result, and were equally liable for the damages contended for.

In Admiralty.

The plaintiffs, Charles E. Garner and E. N. Holt, filed a libel against the steam-boat Captain Miller, at the Jacksonville December term, 1887, claiming damages for a collision with the steam-boat Manatee. W. H. McIntire, master of the Captain Miller, for himself and owners, filed, at the same term, an answer and a cross-libel against the Manatee, for damages for the same collision.

*A. B. Meek*, for libelants.

*Fleming & Daniel*, for respondents.

PARDEE, J. On the twenty-fourth of April, 1886, the steam-boats Capt. Miller and Manatee were navigating the St. John's river, from Green Cove Springs to Jacksonville, when a collision occurred between them, in which the former was slightly and the latter considerably damaged. The owners of the Manatee filed a libel against the Capt. Miller,

alleging that the Manatee was without fault, and the Capt. Miller wholly to blame. The master of the Capt. Miller, for himself and owners, replies with an answer and cross-libel, in which the fault for the collision is thrown entirely upon the Manatee. A great many witnesses, consisting of the crews of both boats, passengers, and spectators on shore, have been examined, and, of course, there is a direct conflict of evidence on nearly every material point.

It seems that both boats, on the morning of April 24, 1886, were lying at the wharf at Green Cove Springs, due to leave for Jacksonville and way landings at 6:30 o'clock. The Miller lay at the end of the wharf, head down stream, and the Manatee on the north or down-river side of the wharf with head out, both with steam up, ready to start without delay, and without turning or backing. The first landing of the Miller was to be Magnolia, on the left bank of the river, and the first landing of the Manatee was Remington Park, on the right bank,—both places several miles below Green Cove Springs; but the course of each boat was the same for the first half mile, and until a certain beacon on the west side of the channel should be rounded or passed. There was understood to be a rivalry between the two boats, as to speed as well as in trade, and this trip was to be the last one of the Miller for the season; and as they both were expected to start at the same time, many people on and off the boats were on the lookout for a boat-race. The master of the Miller says that to avoid a race he started his boat 10 minutes before the time fixed for leaving Green Cove Springs, and that, as he was starting, the master of the Manatee, who was not on board his boat, but was coming down the wharf, quickened his pace, boarded his boat, and started her as soon as the stern of the Miller had cleared the wharf. It is undisputed that the Manatee started after the Miller as soon as the latter had cleared the wharf. The course of the Miller was nearly straight for the beacon. The course of the Manatee was to run a length or two ahead and then straighten up to port in the direction of the beacon. When the Manatee was one or two lengths from the wharf, and before she could have been well straightened up to her course, she sounded one whistle, as a signal she desired to pass the Miller to starboard. This signal was answered by the Miller with one whistle. On the passing of this signal there is no evidence that either boat altered its helm. From this signal on until near the beacon, aside from the facts that whistles were blown by each boat, and that the Manatee closely chased the Miller, and that there was a collision between the bow of the Manatee and the starboard quarter, near the stern, of the Miller, the evidence is too conflicting for the court to say with certainty what was the exact conduct of either boat.

The weight of the evidence so far as the number of witnesses, interested and disinterested, is concerned, is that as the Manatee came up on the Miller's starboard quarter, the latter crowded to starboard, blowing two whistles from time to time, to which the Manatee answered with one, until shortly the Miller changed her course so far to starboard as to put herself directly across the bows of the Manatee and render a collision inevitable. The theory of the Miller's master, and of her learned proctor,

that the master of the Manatee, failing to pass by the starboard, thought to carry out the rumored threat to sail around the Miller, by changing his course to port, passing under the Miller's stern, and then pass her on her port side, and, in so attempting, erred in calculation and failed to clear the Miller, and thus caused the collision, is very plausible, and is strongly supported by evidence and circumstances, and is in a line with the undisputed conduct of the Manatee from the start. The whole case, however these details may be, leaves a decided impression on the mind that for the collision both boats were to blame. The Manatee evidently started from the wharf to race with, and, if possible, beat the Miller. With this design, the master signalled to pass before his boat was under full headway, or had her course. He only partly complied with the navigation rule under which he was pretending to act; for he did not, when he gave the one short blast of the steam-whistle, to signify his desire and intention to pass the Miller by the starboard, *put his helm to port*, as the rule requires. It is clear he did not put his helm to port at that time, for he does not so testify; and the apparent fact is that at the time he had and kept his helm to starboard, so as to lose no time in rounding to his course and in following the wake of the Miller. If he had, as the rule requires, put his helm to port, there would have been no collision, as he would not then have followed directly the wake of the Miller so as to hang on and lap her quarter so close as from 50 to 100 feet.

The weight of the evidence is to the effect that, after the one-whistle signal given by the Manatee and answered by the Miller, very soon the Miller gave two blasts of her whistle, which was answered by the Manatee with one whistle, and then again, before the collision, the two whistles were sounded by the Miller, and the Manatee answered with one. The master of the Miller says that these signals were given by him to indicate that he would continue his course, while the master of the Manatee says that after the Miller had answered the first signal given by the Manatee "he knew of no rule to justify the Miller in blowing two whistles afterwards." Article 19 of the act of congress approved March 3, 1885, entitled "An act to adopt the revised international regulations for preventing collision at sea," (23 St. at Large, 438,) says that:

"In taking any course authorized or required by these regulations, a steamship under way may indicate that course to any other ship which she has in sight by the following signals on her steam-whistle, namely, one short blast to mean, 'I am directing my course to starboard;' two short blasts to mean, 'I am directing my course to port;' three short blasts to mean, 'I am going full speed astern.' The use of these signals is optional; but if they are used, the course of the ship must be in accordance with the signal made."

In the light of this statute, when the Miller answered the one whistle of the Manatee, and afterwards gave the signal of two short blasts, it indicated to the Manatee that the Miller was directing her course to port; and when the Manatee answered with one whistle it indicated to the Miller that the Manatee was directing her course to starboard. But in fact, under the evidence, the Miller was not directing her course to port, but was crowding to starboard, and the Manatee was not directing her

course to starboard but was hugging up to the Miller and attempting to pass her. A proper understanding of these statutory signals, and a compliance with them, would have kept the Miller and Manatee on diverging courses, and a collision would have been impossible. And, if neither the master of the Miller nor the master of the Manatee knew of the statute, (as is extremely probable,) but did know of the navigation rules as to the meaning of these signals under such rules, and had complied with them, then, when the Miller gave the two whistles, she would have held her course, and when the Manatee gave the one whistle she would have put her helm to port, and a collision would not have resulted. See navigation rule 8.

The substance of the whole matter is that the Miller contributed to the collision by not holding her course, and the Manatee contributed to the collision by unnecessary and improper chasing the Miller, running too close to her, and in not complying with the letter and spirit of the navigation rules; or, in the expressive language of Capt. Meyers, a disinterested witness: "Both boats were jockeying." The damages and costs should be divided. The damages to the Manatee, as reported by the commissioner, are not disputed. The damages to the Miller were trifling, and are not contended for on appeal. The accompanying decree will be entered in the case.

This cause came on to be heard on the transcript of appeal, and was argued, whereupon the court, being satisfied that in the collision on April 24, 1886, between the steam-boats Miller and Manatee, on St. Johns river, Florida, both boats were to blame, and that the damages and costs ought to be divided, it is ordered, adjudged, and decreed, for the reasons on file, that libelants Charles E. Garner and Edmund N. Holt do have and recover from W. H. McIntire, master, etc., claimant, and John C. L'Engle, surety on the release-bond, the sum of $507, being one-half the damage suffered by the steam-boat Manatee in the collision aforesaid. And it is further ordered, adjudged, and decreed that the costs of the district court and this court, including the costs of transcript and master's fees, be taxed by the clerk, approved by the district court, and that said costs be paid, one-half by the libelants and their sureties, and the other half by the cross-libelants and their sureties. Execution may issue on this decree five days after costs are taxed.